# KOREA DEEP SEA FISHERIES ASSOCIATION, Plaintiff

## v.

# HO PYO HONG, dba KOREANSA SHIPPING AGENCY, Defendant

---

# HO PYO HONG dba KOREANSA SHIPPING AGENCY, Cross-Plaintiff

## v.

# KOREA DEEP SEA FISHERIES ASSOCIATION, IN SAENG LEE, and J.C. YEOM, Cross-Defendants

High Court of American Samoa
Trial Division

CA No. 78-92

November 25, 1996

Before KRUSE, Chief Justice, VAIVAO, Associate Judge, and BETHAM, Associate Judge.

Counsel:      For Plaintiff/Cross-defendants, Togiola T.A. Tulafono
              For Defendant/Cross-plaintiff, Charles V. Ala'ilima

Opinion and Order:

Plaintiff, Korea Deep Sea Fisheries Association (hereafter "KDSFA"), is an entity organized under the laws of the Republic of South Korea. KDSFA was established to secure provisions and services in overseas ports for its membership of Korean fishing boat owners. KDSFA maintains an office in American Samoa, reporting to its main office in Pusan, Korea.

The local office was managed in the early 1980s by a W.K. Kim (hereafter "Kim"), assisted by defendant/counter-claimant In Saeng Lee (hereafter "Lee"). Sometime in the mid 1980s, Kim left KDSFA to become a boat owner himself, operating as the Kyung Yang Trading Company, and joined KDSFA as a boat owner member. Since Kim's leaving, Lee became KDSFA's local manager, and he has so remained to date.

Defendant Ho Pyo Hong (hereafter "Hong"), together with his wife Aotearoa Hong, have been, since the early 1980s, in the business of provisioning fishing boats that operate out of American Samoa. Hong, doing business under the name "Koreansa Shipping Agency," started out selling live hogs to various fishing boats. He later extended his services to the supply of other food and dry goods lines as well. In time, he was invited by KDSFA's local representatives to supply KDSFA boats.

At the outset, of what was to become a virtually exclusive franchise, Hong quickly befriended Kim and Lee. Initially, KDSFA advanced Hong seed money to fill its early orders given for supply. Subsequently, as his business took a dramatic turn in growth, Hong began to supply KDSFA orders on credit. The order and supply process between the parties was given as follows: an order for a particular vessel's needs would be given to KDSFA, who in turn would pass the order to Hong. Hong would then proceed to fill the order by purchasing from local wholesalers and retailers. After an order was put together, Hong would deliver the same to the vessel where its receipt would be acknowledged in writing on the original invoice by either the vessel's captain or some other ranking officer. Hong would then tender the original invoice to KDSFA for payment and KDSFA would in turn forward Hong's billing to the vessel's owner. The owner would then send the payment to KDSFA and the latter would then pay Hong by way of KDSFA check drawn on the local branch of the Bank of Hawaii.

At least that was the way the business relationship was supposed to have operated. In practice, the relationship between the parties developed into one of credit sales on "open account" basis. In addition, Lee after taking over management from Kim, began to periodically ask Hong for cash loans citing one emergency or another attributed to some KDSFA vessel coming into port. Lee's loan requests became increasingly regular and some entailed substantial five figure amounts. Hong begrudgingly gave these cash advances, no doubt very mindful of the essentially exclusive nature of his franchise with the KDSFA boat community, including his exclusive purchasing access to KDSFA boats for shark fins, a commodity with lucrative export potential.

Over time, the relationship became strained as Hong saw his receivables grow and as he anxiously pushed Lee for payment. He became increasingly uncomfortable with the folding of Kim's Kyung Yang Trading Company, then one of his larger KDSFA-receivables. There were some attempts to address and resolve the payment of Hong's receivables, including joint accounts reconciliation efforts and a failed debt-workout scheme, conceived in July 1992. The plan contemplated both Lee and Hong's taking over the operation of Kim's failing Kyung Yang Trading Company with the aim of paying off a number of

81

KDSFA's accounts payable, including Hong's receivables which were rounded off at $700,000. The scheme never quite got off the ground. As a result, Hong began threatening lawsuits and the arrest of various KDSFA vessels despite Lee's placating overtures about mutual future business prospects.

On August 14, 1992, KDSFA took the initiative and beat Hong to the courthouse. KDSFA filed suit alleging that Hong owed it $960,745.66; it claimed that this sum was the net result of all funds it had given Hong over the years, less the goods that the latter had supplied to KDSFA vessels. KDSFA further sought injunctive relief to stop Hong's communicating "false," "slanderous," and "libellous" accusations concerning KDSFA and its members. Hong, it seems, had made no secret of the fact of the deteriorating business relationship with KDSFA and his threats to have various KDSFA vessels arrested.

Hong immediately responded with his own counterclaim, alleging KDSFA's indebtedness to him in the amount of $2,441,917.70.

## DISCUSSION

Trial herein was a drawn out tedious affair mired not only in language barriers but in a mountain of fragmentary proofs. It became clear at trial that business records were not tailored with the needs of an auditor in mind.

### I. KDSFA's Claim

If KDSFA's tendered proofs were the extent of its business records, it's accounting system consisted solely of the company checkbook. This meager accounting system, however, was not kept in a fashion designed to promote clarity of transactional records. To the contrary, the canceled checks tendered into evidence bespeak a checkbook riddled with ambiguity and vagueness. KDSFA's checks revealed numerous "cash" payments, equivocal memo entries, and in some instances, no explanatory memo entries whatsoever. A large number of the non-cash checks, made out indiscriminately to either "H.P. Hong" or "Koreansa Shipping Agency," merely bore the vague notation of "payment of account," without reference to any invoices, loans, vessels, or KDSFA member. Moreover, the evidence also revealed that memo entries were not always contemporaneous with the making of the check. A former bookkeeper of KDSFA, who now works for Hong, testified to after-the-fact false memo entries by Lee on canceled checks. At the same time, Hong testified about Lee's recurring practice of asking him to cash large KDSFA checks that would necessarily reference him when the checks were ultimately negotiated with the bank. This testimony is consistent

with the apparent deliberately equivocal manner in which Lee kept the KDSFA check book.

In our assessment of the proofs, appearances rather than substance, ambiguity rather than exactness, seems to be the order of KDSFA business records. Unmistakably, Lee's accounting method was done to muddle rather than to accurately chronicle monetary transactions, an accounting manner which readily lends itself to controversy. But when the ulterior goal is the absence of objectively verifiable record keeping, then any attempt at parol explanation of unverifiable items is immediately suspect.

We are satisfied that KDSFA's lawsuit lacks any basis whatsoever. The evidence failed to even remotely substantiate KDSFA's claims of substantial cash advances to Hong. Rather the evidence indicates the opposite. From KDSFA own proofs, consisting of Hong's supply invoice copies, apparently obtained through discovery, dated between 1984-92, together with all of KDSFA's canceled checks referable to Hong and issued between the same time period, a net figure on these written exhibits results in favor of Hong in the amount of $299,518.55.

KDSFA's claims, however, rest principally on parol explanation relating to such questionable items of proof as "cash" check payments and unsubstantiated claims of third-party payments. In order to arrive at its numbers and its asserted credit standing, KDSFA essentially asks the court to resolve all ambiguity in its records, which ambiguities were intentionally created by KDSFA, against Hong. Furthermore, we note that while KDSFA has initiated suit in its own stead, as opposed to in the name of its association members, it nonetheless finds it convenient to cite member bankruptcies in an effort to elude responsibility on some $1.3 million worth of Hong's invoices. KDSFA's claim to having advanced $1.3 million on behalf of insolvent members not only contradicts its agency argument, but sorely stretches the limits of credulity. There is something disingenuous about suing as a corporate entity, or as an association of boat owners for undisclosed members, and then citing agency principles in the way of defense to avoid the defendant's counterclaim.[1] Just as disingenuous, is KDSFA's attempt to assert, for the

---

[1] In most states the common law rule regarding suits by and against unincorporated associations has been changed and modified by statutory enactments. American Samoa has no such enactment. At common law, an unincorporated association could not sue or be sued under its own name. *See* 6 AM. JUR 2D *Associations and Clubs*, § 51. However, it has been held that an unincorporated association which held itself out as capable of contracting in the association's name, is estopped when sued on the contract, from asserting that it is incapable of being sued. *Id., see*

very first time at closing arguments, the contention that all of Hong's pre-1989 accounts ought to be time barred under applicable statutes of limitations.[2]

From all outward appearances, KDSFA's filing suit amounted to nothing more than a sham preemptive strike to distract attention from Hong's threats of law suits against different KDSFA members' vessels. KDSFA's complaint will be dismissed for want of proof, with attorney's fees, entailed in the defense of suit, awarded to Hong.

## II. Hong's Claim

In terms of satisfactory audit trails, Hong's accounting system as reflected by his proofs tendered, was hardly any better than KDSFA's. The accounting records tendered consisted of a note pad maintained by Hong, in Korean characters, which he claimed he had kept to detail loans that he had made over the years to KDSFA, together with a set of "red books" kept partially in English and partially in Korean and Chinese characters. Defendant also tendered into evidence a GSA issue "Record Book," maintained by Mrs. Hong to record her recollections of significant business transactions. These records were not in themselves particularly illuminating, let alone verifiable, while some quite clearly appear to have been made comprehensible only to its author, rather than maintained for ready third-party review.

Although the documentary evidence alludes to a business relationship between the parties dating back to 1984, the starting point of Hong's proofs is a claimed 1987 accounts reconciliation exercise with Lee.

*also Askew v. Joachim Memorial Home*, 234 N.W.2d 226, 236 (1975) (stating that "an association doing business as a legal entity may, if the facts and circumstances warrant, be estopped to deny its own existence"). We believe that this is an appropriate approach for dealing with such circumstances. Here KDSFA did business with Hong as a legal entity. Moreover, KDSFA instituted the present action in its own name. Equity mandates that KDSFA be estopped from now denying its existence as a legal entity, rather than merely an agent of its members. We thus find that KDSFA is a legal entity, with the capacity to sue and be sued on its own behalf.

[2] For one thing, counsel alluded to the wrong statute of limitations. Second, the relationship that developed between the parties was on the basis of "open account," and every subsequent KDSFA partial payment "on account" acknowledged that indebtedness. In such circumstances, the statute of limitations is tolled. *See In re Badger's Estate*, 156 Kan. 734, 137 P.2d 198, 205

Hong professes that such an exercise resulted in Lee's acknowledgment of KDSFA indebtedness to him in the amount of $185,542.50, as of July 1, 1987, for food, cigarettes, pigs, and fishing gear supplied KDSFA vessels. Hong claims that Lee had so acknowledged this indebtedness in his sales logs--one of the "red books."

From our perusal of his sales log, Hong's claim to an agreement from Lee is not readily apparent. In our assessment of the proofs, Hong's pre-1987 claim is found to be insufficiently supported. We fail to see why Hong's starting point should be a contentious reconciliation exercise, with its inherent evidentiary value problems, when hard copies of his pre-1987 invoices are available to him, together with access to KDSFA's canceled checks for the same time frame. Hong's tact becomes evident when we consider his post-1987 claims.

The next premise of his claim is that his post-1987 invoices reveal goods and services supplied by him to KDSFA vessels in the total amount of $2,519,221.64, while payments received from KDSFA and Samoa Packing total $1,906,169.69, a difference of $613,051.95. This net figure is significantly higher than that net figure of $299,518.55, arrived at when utilizing actual supply invoices against canceled payment checks. As with KDSFA's showing, Hong's manner of manipulating proofs in this regard, readily lends itself to appearances rather than substance. His parol explanation also leaves much to be desired.

On the other hand, the evidence does suggest that a net balance is owing Hong when his invoices are tallied up against verifiable payments, while taking into account either side's admissions against interests. These are the least questionable proofs available.

We accept, and so find as fact, that loans made by Hong to KDSFA total $642,000, as stipulated by KDSFA; that Hong's invoices received on record are true and correct as to the goods and cost of goods he supplied to KDSFA, save for those invoices relating to supply of non-KDSFA vessels as conceded by Hong; that the extent of payments made on account by KDSFA to Hong, are the sum of those KDSFA checks received on the record, less the total of those KDSFA "cash" checks contested by Hong as having been given to him for cashing; that third-party payments, principally by Samoa Packing, made on goods and supplies from Hong to KDSFA vessels total $211,430, as stipulated to by Hong.

We reject KDSFA's contention that the failed debt-workout plan of July 1992 somehow resulted in accord and satisfaction, and the discharge of KDSFA's indebtedness to Hong. From our perusal of the relevant documents, we are unable to agree with the construction advocated by

KDSFA, even under the most imaginative reading. From the documents, we conclude that the work-out plan merely offered Hong something in the way of light at the end of the tunnel--a seemingly viable payment plan. This payment plan not only contemplated the satisfaction of Hong's receivables, but also the payment of third-party accounts, some of which were incurred with Lee's personal guarantee. In our view of the evidence, all that this plan really achieved was the abeyance of Hong's threatened law suit(s). Hong recanted his forbearance, however, when he discovered that certain fish proceeds that should have gone toward the payment plan, were diverted elsewhere by either Lee or Kim, or by both.

## ORDER

On the foregoing, the following order will enter: Hong shall, within 30 days of date hereof, file with the Clerk a verified accounting, consistent with our findings and conclusions herein, of monies due and payable on account, with a copy of that accounting to be served upon KDSFA. Hong shall further submit a schedule of attorney's fees (exclusive of fees incurred in prosecuting his counterclaim) for the court's approval.

KDSFA shall have 20 days to file any opposition to the accounting filed by Hong, and if there be none, judgment will be entered accordingly. Otherwise, the Clerk shall thereupon set this matter for further hearing upon KDSFA's filing of any opposition.

It is so ordered.